**CHASEWOOD CONSTRUCTION COMPANY, Appellant,**

v.

**David R. RICO d/b/a Rico Construction Company, Appellee.**

No. 04–83–00608–CV.

Court of Appeals of Texas, San Antonio.

July 31, 1985.

Rehearing Denied Sept. 13, 1985.

Thomas H. Crofts, Jr., Groce, Locke & Hebdon, San Antonio, Patricia Villareal, Jones, Davis, Reavis & Pogue, Dallas, for appellant.

Daniel Sciano, Franklin D. Houser, Tinsman & Houser, San Antonio, for appellee.

## OPINION

Before ESQUIVEL, REEVES and MASSEY,* JJ.

MASSEY, Justice (Assigned).

Plaintiff, David R. Rico d/b/a Rico Construction Company, a subcontractor, brought suit for damages against the general contractor, Chasewood Construction Company (Chasewood), for breach of his two written contracts. Chasewood counterclaimed for breach of contract damages. Rico's action was later amended to include an action for defamation growing out of the same transaction.

Following trial before a jury, the court rendered judgment for Rico for $650,000.00 actual damages and $1,750,000.00 punitive damages on the defamation count, and

---

* Assigned to this case by the Chief Justice of the Supreme Court of Texas as authorized pursuant to Paragraph (d) of Article 1812, Texas Revised Civil Statutes as amended by H.B. 2244 (Acts 1983, 68th Leg., p. 1912, Ch. 354, § 1, effective June 16, 1983).

$51,591.45 as contract damages, together with pre-judgment and post-judgment interest and $36,000.00 as attorney fees. The district court later required Rico to remitt $250,000.00 of the punitive award.

Chasewood appeals from the judgment for both breach of contract and defamation. Because of error in the submission of special issues for the breach of contract action, the judgment for breach of contract is reversed and remanded for retrial. Our reversal affects only the breach of contract portion of the case and is clearly separable without unfairness to the parties. TEX.R. CIV.P. 434. Judgement for actual and exemplary damages for defamation is affirmed.

### BREACH OF CONTRACT

There is no dispute that Chasewood terminated its contract with Rico on December 1, 1981, for framing and trimming apartment complexes. The judgment for damages for breach of contract is dependent upon the answer to Special Issue Number 6 which inquired whether Chasewood made the terminations in bad faith. Special Issue Number 7 was conditional on a finding of bad faith in Special Issue Number 6. Special Issue Number 6 reads:

SPECIAL ISSUE NO. 6

Did Chasewood, on December 1, 1981, act in bad faith in terminating Rico's framing contract and/or the trim contract?

Answer: 'They acted in bad faith' *or* 'they did not act in bad faith' for each contract separately.

You are instructed that 'to act in bad faith' means to act in a manner that is arbitrary, capricious, or unreasonable.

We the jury answer as to the Framing contract and Trim contract as follows:

Framing Contract: They acted in bad faith (Answer 'They acted in bad faith' *or* 'They did not act in bad faith')

Trim Contract: They acted in bad faith (Answer 'They acted in bad faith' *or* 'They did not act in bad faith')

(Emphasis of the word "or" is supplied.)
Because the jury found Chasewood acted in bad faith, it answered Special Issue Number 7 and found $51,491.45 in damages for the termination of both the framing and the trim contracts.

The preliminary instructions included one that every finding made by the jury must be by a preponderance of the evidence.

■ We find reversible error based on the holding of *Southern Pine Lumber Co. v. King*, 138 Tex. 473, 161 S.W.2d 483 (1942). In *Southern Pine Lumber Co.*, the special issue and instruction read:

Special Issue No. _____

Do you find from a preponderance of the evidence that . . .

Answer 'Yes' *or* 'No' as you may determine from a preponderance of the evidence

In both Special Issue Number 6 above and in the instruction to the jury in the cited case of *Southern Pine Lumber Co.* we have supplied emphasis to the word "or." Concerning the language of the special issue in *Southern Pine Lumber Co.* our supreme court wrote:

The Lumber Company was entitled to negative answers to each of the special issues in the event the evidence did not preponderate in favor of affirmative answers thereto. The issues were so framed as to inform the jury that affirmative answers thereto must be based upon a preponderance of the evidence, but vice in them lies in the fact that they were so framed as to inform the jury that negative answers thereto must also be based upon a preponderance of the evidence. Considering the questions and the instructions together as they should be considered, since they are both but parts of the special issues, the conclusion cannot be escaped that, while the jury was instructed to answer 'yes' from a preponderance of the evidence, it was likewise instructed to answer 'no' from a preponderance of the evidence.

Had the instructions been merely to answer the questions 'yes' or 'no' the special issues would not have been subject to the objections urged against them.

*Traders & General Insurance Co. v. Jenkins,* 135 Tex. 232, 141 S.W.2d 312. But they went further than that and informed the jury, in effect, that whether their answers were 'yes' or 'no' they must, in either case, be determined from a preponderance of the evidence. We cannot give our approval to that character of submission of issues. *Psimenos v. Huntley,* Tex.Civ.App., 47 S.W.2d 622, 624, expressly approved and adopted in *Texas Employers Insurance Association v. Lemons,* [125 Tex. 373, 83 S.W.2d 658] *supra.*

Under any view the issues were confusing and that within itself condemns them. This language found in the *Huntley* case, *supra,* was expressly approved in the *Lemons* case, *supra:* ' * * * We think, under the facts, the form of the charge was calculated to confuse rather than aid the jury in determining the answer to the question under discussion, and that appellant was deprived of his right to have either a specific instruction placing upon appellee the burden of proving the affirmative of such question, or to have such question so framed that the jury would necessarily understand that the same should be answered affirmatively only in the event the testimony preponderated in favor of such answer, and, absent such preponderance, in the negative. * * *'

For the error above indicated, the judgments of the Court of Civil Appeals and trial court will be reversed and the cause remanded.

138 Tex. 473, 161 S.W.2d at 483–84.

Rico argues that objection to Special Issue Number 6 was not properly preserved.

In this case Chasewood Construction Company objected to Special Issue Number 6 because "it improperly places the burden upon the Defendant." Earlier, by a general objection to all the special issues submitted with an instruction similar to that of Special Issue Number 6, Chasewood stated to the court:

I would like to make the same objection to two–A. I would like to make the objection to every issue in this charge that doesn't call for a 'yes' or 'no' answer and get it out of the way and succinctly say that our position is that when a jury's choices are say 'yes,' we find that fact inquired about or we find and only other choices is a finding of the opposite of that fact, that it places a heavier burden on the Defendant's position on that issue than the law requires it, and that's why we are submitting it. Each of these questions should be couched in, do you find from a preponderance of the evidence that a fact exists. If so, answer we do. If you don't, answer we do not.

■ We hold there was no waiver of the error in said issue number 6. We are of the opinion that the trial court was fully apprised of the nature of Chasewood's objection.

Plaintiff David R. Rico's judgment based upon the breach of contract inquired about by Special Issue Number 6 is reversed and the cause remanded.

## THE TORT CASE FOR DEFAMATION

■ Rico's original petition was filed May 17, 1982. Because plaintiff Rico's cause of action for defamation was added to pleadings filed on June 9, 1983, it is contended by Chasewood Construction Company that the trial court should have sustained it's plea of limitation under provisions of TEX.REV.CIV.STAT.ANN. art. 5524 (Vernon 1958), "Actions to be commenced in one year." The added defamation action grew out of the same transaction which gave rise to the breach of contract action; it was not wholly based upon or grown out of any new, distinct, or different transaction and occurrence than that relied upon in the case pled within the year. Under the circumstances, such an action in tort—filed more than one year after such occurrence—is not barred by the plea of limitation. *Leonard v. Texaco, Inc.,* 422 S.W.2d 160, 163 (Tex.1967); TEX. REV.CIV.STAT.ANN. art. 5539b (Vernon 1958).

Plaintiff Rico was a subcontractor for framing and trimming and defendant Chasewood the general contractor. On December 1, 1981, Rico left the job site to take his automobile to a garage. His office, located away from the job site, knew of his whereabouts. During his absence, Mr. Michael Hope, a vice president of Chasewood with principal operating responsibility, visited the job site with Paul Clarkson, project manager for the Austin-San Antonio area. Terry Bailey was the "Project Job Supervisor," who had an office in a trailer on the job site. At midmorning the three men "walked the job site" generally to observe the work. At some point, they were informed by Ray Bridgewater, representative of a plumbing subcontractor who had done many jobs for Chasewood, that he had observed a regular employee of Rico, Johnny Wechsler, driving out of the job site with Chasewood materials in his vehicle.

When the three men were informed of this, Johnny Wechsler was present at the job site. Hope and/or Clarkson instructed Bailey to "fire" Wechsler. Bailey located Albert Morin, "Project Superintendent," and told him to "fire" Wechsler. Morin did so and Wechsler left the premises. However, Hope soon decided that he should talk with Wechsler. Rico's office located Rico and told him to find Wechsler and bring him to the job site. Rico did this. About noon Wechsler was closeted with Hope in the Chasewood trailer on the job site. Rico remained outside the trailer at Hope's request.

Hope and Clarkson conducted the interview with Wechsler. Wechsler testified:

They accused me—first they accused me that I took their material. That they were missing something like 40, 50, $60,-000.00 and they told me that they went to my house and they found the material there, that they found some cedar.... I told them that I didn't have—and they they accused—well, we know that Rico has the material, but where is it? He says, you know where its at. And I told them that I didn't know anything about

it. He said, well, we can't get; you know, Rico; well, we'll just have to settle for you.

Concerning the cedar siding found in Wechsler's garage, Wechsler claimed that six months earlier he purchased it from an individual for "$60.00 to $75.00." He stated that it was exterior siding lumber which he was using to remodel the interior of his house. He further stated that it was made up of eight foot pieces, about six inches wide by one inch in thickness.

The same day, following his conversation with Hope and Clarkson, Wechsler stated to Rico that the Chasewood representatives had accused him of stealing materials; that he, Wechsler, told them that he had not taken materials; and that they then accused Rico, stating that they wanted their material and they knew that Rico had it. Wechsler further testified that what he told Rico had actually occurred; the statements and accusations by Chasewood officials were actually made.

Hope testified that in the conversation with Wechsler, "He confirmed the allegations against David Rico, but refused to cooperate for fear of his and his family's safety from reprisals from David Rico." Hope testified that he was not accusing Rico of theft, and had never accused him or published anything slanderous.

Immediately following the conversation with Wechsler, Hope called Rico into the Chasewood office, and, according to Hope, terminated the Chasewood contracts with Rico and orally fired Rico because of improper supervision. He stated he did not "fire" Rico for theft, i.e., terminate the Rico contracts for that reason; if anyone said that he had "fired" Rico for theft, they would not be telling the truth.

Rico testified differently, saying failure to supervise was never mentioned to him. He stated that after Wechsler's interview with Hope and Clarkson, he was summoned into the Chasewood trailer office, where Michael Hope accused him of having taken $12,000.00 in materials belonging to Chasewood. Rico stated that Hope said to him: "Where are the materials you took off the

job site or stole ... the materials ... the $12,000.00 you stole from the job.... I want the materials back or [you] get off the job." No mention was made of any improper performance as a subcontractor under his contracts. The only topic was theft of Chasewood materials. Rico expressed amazement and Hope added, "I am dead serious. Bring me the $12,000.00 worth of materials or get off the job right now." Then Rico notified his employees and subcontractors and moved out into the street.

Rico's attorney developed evidence on contractual rights, particularly on breach of such rights as provided by the contract, so as to justify termination. Termination, Rico's attorney demonstrated, would be prepared for in a dispassionate manner, with proper notice and opportunity to cure the cause for complaint. Even if there was an undoubted breach, a termination would be made in a manner convenient to Chasewood and its accountants. For example, one might effect the termination at the end of some work period and not in the middle of the day when it would be necessary to stop all activity without preparation to do so by either Chasewood or Rico. Given our disposition of the breach of contract cause of action it is not necessary to elaborate on the breach.

However, the evidence above indicates that there was considerable passion by Michael Hope sufficient to cause him to terminate and fire Rico immediately, without any precaution for protection of the progress of activities of a general contractor. The uncontradicted testimony of Rico was that he was ordered to get his equipment and his men off the premises instantly. This meant that two fork-lifts, some vehicles, and over one hundred ten men who had been engaged in performance under the Rico subcontracts had to be quickly removed from the premises. This, in turn, meant that such equipment and men were literally "in the street" immediately outside the premises, unpaid and incensed. Their interests were obviously in peril and they wanted Rico to tell them why. This he did.

Rico told his employees that he was accused by the Chasewood management of stealing materials from the job site and because of this charge he and all the personnel associated with him had been ordered to leave. It was reasonable for Rico to explain the departure from the job site.

We are of the opinion that Michael Hope, in the exercise of ordinary care, should have known that Rico would feel an obligation to give an explanation to his personnel and would actually tell them what had occurred. The jury found that a reasonably prudent person in the circumstances would have known that Hope's statement would be communicated to others by Rico.

There are other instances of defamatory statements, oral and written, chargeable to Chasewood but the most material as supportive of the substantial damages found by the jury was the statement of Hope to Rico—through Rico's mouth—a communication from Hope to the Rico employees assembled. Each of Rico's men would have left with the memory that the Chasewood management had charged David Rico with stealing its materials, and had "fired" him for that reason, whether there was truth or not in the accusation. All the men would have made frequent and continuous moves to other job sites and would be employed by other contractors and subcontractors. Certainly such inference could be drawn from evidence adduced. Word of the defamation would thereby be carried to the very persons with whom Rico could be expected to seek work as a subcontractor in the months and years to follow. This would constitute a rapid dissemination of the defamation, and, by its nature, dissemination to the very entities upon whom Rico would have relied to give him work as a subcontractor. Significantly, at trial, Chasewood stipulated that Rico was not guilty of having wrongfully taken materials belonging to Chasewood.

The jury findings to one cluster of special issues support a judgment for David Rico for damages for defamation against Chasewood:

SPECIAL ISSUE NO. 5.

Did Hope, in the course and scope of his employment for Chasewood, state to Rico on December 1, 1981, words reasonably meaning that Rico was being fired for stealing materials from Chasewood?

Answer: 'Yes' or 'No'

We the jury answer: 'Yes.'

SPECIAL ISSUE NO. 5A.

[Omitted because immaterial to disposition of case]

SPECIAL ISSUE NO. 5B.

[Omitted. The issue was conditionally submitted upon a faulty and immaterial special issue; and is to be disregarded because so conditional. However, it, too, is immaterial to a disposition of the case.]

SPECIAL ISSUE NO. 5C. [Conditionally submitted upon Issue No. 5.]

Was the statement made by Hope made with knowledge that it was false in any degree or made with reckless disregard of the truth or falsity of the statement in any degree?

Answer: 'Yes' or 'No'

We the jury answer: 'Yes.'

SPECIAL ISSUE NO. 5D. [Conditionally submitted upon Issue No. 5.]

At the time Hope stated to Rico that Rico had stolen materials from Chasewood, would a prudent person have reasonably expected that such statement would be communicated to others by Rico?

Answer: 'Yes' or 'No'

We the jury answer: 'Yes.'

SPECIAL ISSUE NO. 5E. [Conditionally submitted upon Issue No. 5.]

Did Rico suffer any damages and/or injury as a proximate result of Rico reasonably relating to others that he had been fired for theft of materials from Chasewood?

Answer: 'Yes' or 'No'

We the jury answer: 'Yes.'

At the time the objections were made to the proposed charge of the court, special issue "5C" was labelled special issue "5B" but was the same material issue. Special issues "5D" and "5E" were labelled "5C" and "5D." We consider spurious the claim of Rico that there was waiver of any error in the newly numbered special issues unless new objections using the new numbers were made. Anyway, the issues above were not improperly submitted, considering all the objections made by Chasewood, and of this Rico reaps benefit from the jury findings.

The material question is: There having been no special issue inquiry of whether the circumstances "reasonably required" that Rico relate to his employees, who were abruptly ordered from the premises, that he had been fired for theft of the materials, and there having been objection to the court's charge because of absence therefrom of a special issue by which the jury might find that Rico's explanation was in fact "reasonably required," has Rico nevertheless obtained jury findings by which he is entitled to recover his damages in tort for the Chasewood defamation?

[redacted] The jury findings support Rico's judgment for damages for defamation. We hold that, by the circumstances, when Rico obtained findings in the number 5 cluster of special issues, especially the finding that Hope, as a reasonably prudent person, should have expected that his defamation of Rico to his face would be communicated to others by Rico, he established his prima facie case for damages. In *First State Bank of Corpus Christi v. Ake,* 606 S.W.2d 696, 701 (Tex.Civ.App.—Corpus Christi 1980, writ ref'd n.r.e.), the plaintiff was charged to have been defamed by the defendant when the defamatory communication was made to the plaintiff, and the plaintiff then communicated it to third parties. The plaintiff's injuries and damages were shown to have been a consequence of his own communication to third parties. The defendant had knowledge that the plaintiff was likely to communicate the defamation to third persons.

The court in *Ake* stated:

One who communicates defamatory matter directly to the defamed person, who himself communicates it to a third party, has not published the matter to

the third person if there are no other circumstances. If the circumstances indicated that communication to a third party is likely, however, a publication may be properly held to have occurred. Restatement (Second) of Torts § 577, comment m (1977). Likewise, if a reasonable person would recognize that an act creates an unreasonable risk that the defamatory matter will be communicated to a third party, the conduct becomes a negligent communication, which amounts to a publication just as effectively as an intentional communication. Restatement (Second) of Torts § 577, comment k (1977).

606 S.W.2d at 701.

Comment k of Restatement (Second) of Torts § 577 (1977), under subheading "Intentional or negligent publication" reads:

There is an intent to publish defamatory matter when the actor does an act for the purpose of communicating it to a third person or with knowledge that it is substantially certain to be so communicated....

It is not necessary, however, that the communication to a third person be intentional. If a reasonable person would recognize that an act creates an unreasonble risk that the defamatory matter will be communicated to a third person, the conduct becomes a negligent communication. A negligent communication amounts to a publication just as effectively as an intentional communication.

The *Ake* case honored the holding in *Lyle v. Waddle*, 144 Tex. 90, 188 S.W.2d 770 (1945), which holds that a plaintiff cannot recover for injuries sustained by reason of a publication which he authorized, invited or procured, but at the same time held that under the circumstances the *Lyle* rule was inapplicable. Those circumstances were reflected in the quoted language immediately above, as taken from the text in *Ake*, 606 S.W.2d at 701.

The objection levelled by Chasewood to Special Issue Number 5 was that it was not an ultimate issue because a statement made to the person who is claiming injury cannot support a defamation action. The court overruled an objection to Special Issue 5A, whether Hope's statement was "substantially false when made," which claimed the issue constituted a charge on the weight of the evidence. The language was removed the following morning at the request of Rico's attorneys and any question became moot. Objections made to Special Issue Numbers 5A and 5B are overruled as immaterial, the issues themselves being immaterial to our disposition as we additionally hold.

Objection made to Special Issue Number 5C was that it was not, as a matter of law, an ultimate issue in the case because it inquired whether the alleged statement, made only to Rico, would reasonably be communicated to others. (In other words, Chasewood was aiming at its true complaint; because there was absence of inquiry of "reasonable necessity" that Rico tell third persons of the defamation of him communicated to him.) Objection made to Special Issue Number 5D (submitted as Special Issue Number 5E) was because the standard of "reasonably relating to others" is an inaccurate statement of the law and that the standard should be, "was Rico reasonably required to relate it to others." Our rulings are upon objections made to the charge.

The foregoing objections were not good, whether the objections made to the then special issues 5C and 5D, or made to the submitted issues, numbers 5D and 5E. There was no objection to Special Issue Number 5 and the "5 cluster" of issues relative to the somewhat faulty inquiry of whether the words spoken by Hope had the "reasonable meaning" that Rico was "fired" for stealing. Had the objection reached the sufficiency of such a submission it is suspected that our labors would be more difficult.

The answers returned to Special Issue number 5, and 5A through 5E, as same are material to our disposition, save the judgment for defamation. This is not because we might be able to go along with the plaintiff and his lawyers and find a waiver

of any portion of the Chasewood objections and exceptions made to the court's charge the day before the case was submitted to the jury—because the following morning, at plaintiff's request there was a change in the numbering of several issues from that by which they were numbered at the time of the objections and exceptions. That such occurred made it necessary, according to Rico's theory, that the Chasewood attorneys were obliged to start over with new objections and exceptions to the charge. This Chasewood and its attorneys did not do. Our holding is that it was not prejudiced thereby and lost no right of any prior objection and exception made to an issue like unto which these submitted might be found germane. We cannot give sanction to such; it would smack of unfair trial.

From the whole record it is obvious to us that the trial court was not confused, and that the Chasewood attorneys justifiably proceeded with security in the belief that they had preserved any error there was— as sought to be shown to the court by the objections and exceptions presented—and directed to the charge as prepared by the court the day before. Specifically, there was no waiver of objection to a special issue asking the same question in substance, though differently numbered.

From a fair analysis of the pleadings, plaintiff Rico's cause of action for wrongful termination of contracts was an action based upon contract. Tortious breach of contract was not alleged. We cannot see the availability of an action in tort as applied to breach of contract. This is not a case where election of remedies is involved. If it was there would be no question but that by time of submission Rico had waived the tort and sued on the contracts. The submission of issues on damages resulting to Rico from Chasewood's breaches of contract was by Special Issue Number 7.

Following Special Issue Number 7 was submitted Special Issues Number 8, 8A, 8B, 8C, and 8D having relation to an element of defamation of Rico in written reports, alleged to have amounted to publication of libel, and also to have caused injury and damage to him. Actually we find the communications which took place by such reports to have been privileged and directed to persons entitled thereto. Furthermore, from our search of the record we find no substantial evidence of damage accruing to Rico from the circulation of anything harmful to Rico reflected in the reports. Of course, we are also of the opinion the damage awarded in the trial court's judgment has other support.

Special Issue Number 9 was the issue for actual damages resulting to Rico from the defamation. Actual damages found were $650,000.00.

Special Issue Number 10 read, as follows:

SPECIAL ISSUE NO. 10.

What sum of money, if any, should be assessed against Chasewood Construction Company as exemplary damages? ('Exemplary damages' means an amount that you may, in your discretion, award as an example to others and as a penalty or by way of punishment, in addition to any amount you may have found as actual damages.) Answer in dollars and cents, if any. We the jury answer: $1,750,000.00

The only objection made to Special Issue Number 10 was that there had been no proper previous inquiry asking whether the statement (not identified as to what statement) was made with actual malice, which is the requisite of damages. There is an absence of any such inquiry in any issue.

However, in the point of error complaining of Special Issue Number 10, Chasewood complains the jury was permitted to find exemplary damages by considering, in addition to the actual damages for defamation of Rico the actual damages the jury had found attributable to the breaches of contract by Chasewood. There was no such objection at trial. The complaint by point of error is waived.

By remittitur the trial court caused plaintiff David Rico to reduce the exemplary damage finding by $250,000.00. On appeal defendant Chasewood complains of exces-

siveness in the $1,500,000.00 exemplary damages and excessiveness of the total judgment.

■ We see no basis for complaint in the $650,000.00 finding as actual damages to Rico and of the judgment based thereon. It was not unreasonable an amount in view of the evidence in the case and, therefore, no indication that the jury was motivated by passion, prejudice, or other improper motive in making the actual damage finding.

Of more concern is the $1,500,000.00 exemplary damages awarded by the trial court in its judgment after Rico's remittitur in reduction of the jury's $1,750,000.00 finding on exemplary damages. Chasewood requests an additional remittitur.

■ Exemplary damages, unlike actual damages, are not measured by the jury's application of the rule of fair compensation, but by that of just punishment. There is no fixed ratio between the two. The amount is largely within the discretion of the fact finder; the appellate court will not disturb the verdict or the amount of judgment unless the amount awarded is unjust, unreasonable, and so excessive as to justify a conclusion that it was the result of passion, prejudice, or other improper motive.

■ A conclusion that the judgment for exemplary damages resulted from passion, prejudice, or other improper motive is not possible by the record presented on the appeal. The amount of exemplary damages awarded by the judgment of the trial court are not so disproportionate to the actual damages that excessiveness in the award as punishment for the defamation is apparent. Complaint of excessiveness in the judgment for actual and exemplary damages resultant from the defamation is overruled. 36 Tex.Jur.2d *Libel & Slander* § 103 (1962).

The judgment of the trial court for damages for breach of contract and for attorney's fees is reversed and the cause remanded.

The case on appeal, as the same includes the Rico cause of action for damages for breach of contract on the part of defendant Chasewood is severed from the plaintiff Rico's cause of action for actual and exemplary damages against Chasewood, with appropriate order by the clerk of this appellate court to accomplish the severance, along with the remand of the case for damages flowing from breach of contract.

The judgment of the trial court for damages because of the defamation is affirmed.

Costs of appeal as applied to both cases are adjudged one-half as against appellant Chasewood Construction Company, and one-half as against appellee David R. Rico.

REEVES, Justice, dissenting.

I respectfully dissent. While I agree with the majority's disposition of the breach of contract cause of action, I would not affirm the judgment for the defamation action.

Publication of a defamation is essential to liability. The general rule in Texas is that a plaintiff cannot recover for injuries sustained by reason of publication of an alleged defamation if such publication was consented to, authorized, invited, or procured by the plaintiff. *Lyle v. Waddle*, 144 Tex. 90, 188 S.W.2d 770, 772 (1945).

The Restatement (Second) of Torts provides a narrow exception to this general rule:

> m. Recipient is the defamed person. One who communicates defamatory matter directly to the defamed person, who himself communicates it to a third person, has not published the matter to the third person if there are no other circumstances. If the defamed person's transmission of the communication to the third person was made, however, without an awareness of the defamatory nature of the matter and if the circumstances indicated that communication to a third party would be likely, a publication may properly be held to have occurred.

RESTATEMENT (SECOND) OF TORTS, § 577 comment m (1977). Thus, under the Restatement rule, there is no publication if the defamed person repeats a slanderous remark unless (1) the defamed person is unaware of the defamatory nature of the matter, and (2) circumstances indicate the communication to a third person would be likely.

The Restatement (Second) of Torts also distinguishes between intentional and negligent publications:

> k. Intentional or negligent publication. There is an intent to publish defamatory matter when the actor does an act for the purpose of communicating it to a third person or with knowledge that it is substantially certain to be so communicated. . . .

> It is not necessary, however, that the communication to a third person be intentional. If a reasonable person would recognize that an act creates an unreasonable risk that the defamatory matter will be communicated to a third person, the conduct becomes a negligent communication. A negligent communication amounts to a publication just as effectively as an intentional communication.

RESTATEMENT (SECOND) OF TORTS, § 577 comment k (1977).

The majority opinion, like the opinion it relies upon, *First State Bank of Corpus Christi v. Ake,* does not properly differentiate between these comments in the Restatement.

Under comment m, a two prong test must be satisfied. It is not in this cause.

Under comment k, Hope made the defamatory remark intentionally if he did so with the knowledge that it was substantially certain to be communicated to a third person. Alternatively, Hope is also liable if he made the remark negligently if "a reasonable person would recognize that an act creates an unreasonable risk that the defamatory matter could be communicated to a third person." There is no jury finding to support either of the above propositions.

Rico relies upon the jury finding to the following special issue:

At the time Hope stated to Rico that Rico had stolen materials from Chasewood, would a prudent person have reasonably expected that such statement would be communicated to others by Rico?

Answer 'Yes' or 'No.'

We the jury answer Yes.

The jury finding does not establish that Hope intended the publication of the remark by Rico; neither does the finding support a negligent publication since it does not rise to the level of necessity. Expecting a statement would be repeated goes only to foreseeability; expecting the statement would *have* to be repeated would support necessity.

The importance of the necessity of publication by a plaintiff is discussed by Prosser:

> Ordinarily the defendant is not liable for any publication made to the plaintiff himself, even though it was to be expected he might publish it. There are, however, a few cases in which, because of the plaintiff's blindness or immaturity, or because of some necessity he was under to communicate the matter to others, it was reasonably to be anticipated that he would do so, and the writer has been held to be responsible.

W. PROSSER, HANDBOOK OF THE LAW OF TORTS, § 113 (1971).

At trial Chasewood objected to the submission of the above special issue because it was an inaccurate statement of the law. Counsel for Chasewood stated:

> [T]he standard should be, was he reasonably required to relate it to others ... rather than just this issue that just more or less leaves that element of this theory to whether Mr. Rico wanted to relate it to others, rather than for some business reason was it reasonably required that he reveal what was told to him.

Proper objection to the issue was made. I would hold the special issue was defectively submitted; the jury finding does not establish the necessity of Rico repeating the defamation and there is, therefore, no

basis for liability by Chasewood for Hope's statement. I would remand for a retrial.